IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JOHN C. GIDLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12-CV-374-APR |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration[1], | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the

Commissioner filed by the plaintiff, John C. Gidley, on September 17, 2012. For the following

reasons, the decision of the Commissioner is **REMANDED.**

*Background*

On January 25, 2010, the Plaintiff, John C. Gidley, filed an application for disability

insurance benefits and an application for Supplemental Security Income, alleging disability

beginning on September 1, 2008. (Tr. 181-187) His claims were denied initially on March 10,

2010 and again on June 11, 2010. (Tr. 91, 104) Gidley then filed a written request for a hearing

which took place on April 12, 2011 in front of Administrative Law Judge (ALJ) Michael

Hellman. (Tr. 51-86) The ALJ issued an unfavorable decision on June 15, 2011. (Tr. 30-50)

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social
Security. Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically
substituted for Michael J. Astrue as the named Defendant.

The Appeals Council then denied Gidley's request to review the ALJ's decision on July 27, 2012, leaving the ALJ's decision as the final decision of the Commissioner. (Tr. 1-3) Gidley now seeks judicial review of the denial for his claim for benefits.

At the hearing before the ALJ, Gidley testified that he was disabled from worsening back pain, numbness in his legs, and mental impairments resulting form a motorcycle accident in 1989. (Tr. 58-59) Gidley reported that he had a high school GED. (Tr. 55) He last worked in 2007 through 2008, when he had his own lawn care service. (Tr. 55-58, 222) However, he testified that he often did not remember details, such as who he worked for or when he last worked. (Tr. 73) From 1995 to 2002, Gidley worked construction at a factory, and in 2005, he did janitorial work for a cleaning service (Tr. 222) Upon questioning, Gidley could not remember the full name of the person he worked for or the company name of the cleaning service. (Tr. 57)

Gidley reported that he was angry a lot, walked off jobs, and had frequent headaches since his accident. (Tr. 58, 69, 74-75) He stated that his headaches came and went but that he could not recall when they first started. (Tr. 64-65) Tylenol sometimes relieved the pain. (Tr. 65) He estimated that he could pay attention to a task for thirty minutes before losing interest, and he could not recall if he ever had suicidal thoughts. (Tr. 74-75)

Following the accident, Gidley was in a coma for three weeks and had 20 weeks of therapy for his brain damage. (Tr. 69-70) He stated that he had problems with his left ear, but he could not recall how often. (Tr. 71) He became dizzy twice a week and had to lie down, usually for about 30 minutes. (Tr. 72)

Gidley could not stand very long because of leg numbness but was uncomfortable sitting

for prolnged periods of time.  (Tr. 60) His back pain and leg issues were progressively getting worse, and standing caused leg numbness, but sitting made it better.  (Tr. 59) However, neither position was comfortable, and he could not sit or stand for very long.  (Tr. 59)  Gidley estimated that he could lift 50 pounds and walk one-half block to one block.  (Tr. 68) The back pain and leg numbness prevented him from doing yard work.  (Tr. 67)  He also testified that he averaged two falls per month.  (Tr. 72-73) This generally occurred when he was walking around the yard and ascending or descending stairs.  (Tr. 73)  He was prescribed muscle relaxants for his symptoms.  (Tr. 68)

Gidley also testified that he saw Dr. Bhauani Prasad, a psychiatrist, and Dr. Prasad's husband for anger and mood swings.  (Tr. 62-63) Dr. Prasad prescribed Gidley several medications for his anger issues, including Risperdal, Citalopram, and Clonazepam.  (Tr. 62) He last saw Dr. Prasad four or five months before the hearing.  (Tr. 62)

Gidley testified that he was not receiving any back treatment because he did not have insurance.  (Tr. 60)  He did not fill his prescriptions because he could not afford them.  (Tr. 62-63) He informed the ALJ that he had been on his wife's insurance until he separated from his wife in September 2010.  (Tr. 55, 60) He was waiting to see if he was going to be approved for Medicaid.  (Tr. 60)

Gidley stated that he has lived with his mother since he separated from his wife.  (Tr. 55) He helped around his mother's house and shopped for groceries.  (Tr. 65-66) He drove, sometimes took his children to school, performed his personal care, and prepared his own meals.  (Tr. 66-67) A typical day consisted of making breakfast and sleeping a lot.  (Tr. 67, 75-76) He could not recall if he had any problems with energy.  (Tr. 76)

The ALJ issued his decision denying benefits on June 15, 2011. At step one of the five step sequential analysis for determining if a claimant is disabled, the ALJ determined that Gidley had not engaged in substantial gainful activity since his alleged onset date of September 1, 2008. At step two, the ALJ determined that Gidley had the following severe impairments: lumbar degenerative disc disease, obesity, cognitive disorder, depressive disorder, and mood disorder. (Tr. 35) The ALJ then determined that Gidley's impairments, when considered individually and in combination, did not meet or medically equal one of the listed impairments in the regulations. (Tr. 36) With regard to Gidley's mental impairments, the ALJ found that Gidley had mild restrictions in activities of daily living, moderate difficulties with social functioning, including anger issues, frustration, mood, and temper swings, and moderate difficulties with concentration, persistence, and pace, including difficulty with memory, completing tasks, and following instruction. (Tr. 36-37) The ALJ recognized a particular problem with Gidley's remote memory. (Tr. 37)

The ALJ next assessed Gidley's RFC and determined that he retained the ability to perform medium work with the exception that he was limited to simple, routine, and repetitive tasks with relaxed or flexible production rate requirements and occasional interactions with the public, co-workers, and supervisors. (Tr. 38) In reaching this decision, the ALJ first explained that Gidley alleged a disability due to functional limitations resulting form multiple physical and mental impairments. (Tr. 38) Gidley stated that he had back problems, numbness in his legs, anger problems, failed to take orders well, suffered from headaches, chest pains, left ear problems, and dizziness, often fell, and had concentration problems. (Tr. 38) The ALJ further summarized Gidley'stestimony before turning to the objective medical evidence. (Tr. 38)

The ALJ determined that the medical evidence was consistent with Gidley's allegations of lumbar degenerative disc disease.  (Tr. 38) The ALJ stated that Gidley alleged a disability since September 2008 but that he did not begin receiving treatment until February 12, 2010.  (Tr. 38)  Dr. B. Saavedra, a consultative examiner, stated that Gidley's musculoskeletal exam only showed spinal and paraspinal tenderness in the lumbar spine.  (Tr. 38) She reported that Gidley had a normal range of motion in the lumbar spine, normal gait and posture, and a normal neurological exam.  Dr. Saavedra further stated that he walked with a straight posture and appeared comfortable in a seated and supine position.  (Tr. 38)

The ALJ noted that Gidley was not taking any medications until April 2010.  (Tr. 39) His treating physician, Mridula Prasad, reported that Gidley had limited flexion and bilateral spasms in the lumbar spine.  (Tr. 39) Gidley told Dr. Prasad that he fell because his legs gave out.  (Tr. 39) A MRI of the lumbar spine conducted in in April 2010 showed mild to moderate lumbar disc protrusions with some stenosis at L4-L5 and lumbar disc degeneration with some stenosis at L3-L4 levels.  (Tr. 39) The ALJ noted that the medical records showed sporadic treatment for Gidley's lumbar degenerative disc disease until September 2010.  (Tr. 39) Dr. Prasad reported that Gidley had bilateral radicuopathy in the lumbar spine, but because he had a normal gait, the ALJ stated that this suggested greater functional ability.  (Tr. 39) The treatment records did not show any treatment or follow-up examinations for Gidley's lumbar degenerative disc disease, which also suggested greater functional ability.  (Tr. 39) The ALJ concluded that the totality of the evidence showed that Gidley has the RFC to perform less than the full range of medium work.

The ALJ next discussed Gidley's treatment for his mental health conditions.  (Tr. 39)

Gidley did not receive medical treatment for his mental impairments until March 2010. (Tr. 39) Clinical psychologist Irena M. Walters noted that Gidley was alert, oriented, and cooperative, but he complained of working with people because of his short temper. (Tr. 39) Gidley reported that he couldgroom, bath, and dress independently and that he sometimes performed yardwork at his house and drove his kids to and from school. (Tr. 39) Gidley also reported that he was in a great mood when he was not with someone. (Tr. 39) For these reasons, the ALJ limited Gidley only to occasional interaction with the public, co-workers, and supervisors. (Tr. 39)

Dr. Walters stated that Gidley was able to recall one out of three cities after five minutes and that he was able to repeat four digits forward and three backward. (Tr. 39) He could add, subtract, multiply, and identify basic colors, but he was not able to do serial threes. (Tr. 39) Dr. Walters noted that Gidley had some cognitive impairments since his motorcycle accident in 1989. (Tr. 39) Dr. Walters diagnosed Gidley with cognitive disorder, depressive disorder, and mood disorder. (Tr. 39) Dr. Walter assigned Gidley a global assessment function (GAF) score of 50 to 55, indicating serious impairments in social, occupational, and school functioning. (Tr. 39) The ALJ stated that the March 2010 to February 2011 medical records showed routine and conservative treatment for Gidley's mental impairments. (Tr. 39) The ALJ concluded that Gidley's mental impairments did not prevent him from performing simple, routine, and repetitive tasks within a relaxed or flexible production rate requirement. (Tr. 40)

The ALJ stated that he considered Gidley's obesity, and noted Gidley's height, weight, and body mass index. (Tr. 40) The ALJ explained that Gidley had some limitations due to his obesity but that there was no evidence that he had exacerbated symptoms or significant exertional and non-exertional functional limitations as a result. (Tr. 40) The ALJ stated that

6

Gidley's obesity did not impose any further restrictions than those already noted in the RFC assessment. (Tr. 40)

The ALJ next assessed Gidley's credibility, noting that his alleged limitations were not entirely consistent and supported by the medical records. (Tr. 40) The ALJ stated that although Gidley complained that his symptoms began after his 1989 motorcycle accident, the medical records did not show any relevant treatment until 2010. (Tr. 40) The treatment records showed routine and conservative treatment for his physical and mental impairments. (Tr. 40) The ALJ noted that there were no underlying impairments during the period at issue to give rise to the chest pain, dizziness, and left ear problems Gidley testified to experiencing. (Tr. 40) The ALJ further explained that the records showed that Gidley had a normal gait and only fell once in April 2010, which contradicted his testimony. (Tr. 40) The ALJ stated that the medical evidence did not show any nerve aggravation or compression in the lumbar spine. (Tr. 40) Additionally, Gidley's daily activities were not as limited as one would expect given his complaints of disabling symptoms and limitations. (Tr. 40)

The ALJ also noted that Gidley never applied for Medicaid and reported that he did not go to the doctors because he did not have money. (Tr. 40) He also alleged that he could not afford to fill his medications that his psychiatrists prescribed. (Tr. 40) Gidley reported that he was on his wife's insurance policy until September 2010. (Tr. 40) Because of the lack of medical treatment prior to September 2010 and Gidley's ability to spend $1,000 on Christmas presents for his children in December 2010, the ALJ discounted Gidley's credibility. (Tr. 40)

At the hearing, Gidley stated that Dr. Kondamuri gave him lumbar injections, but the record did not include any treatment by this physician. (Tr. 40-41) The ALJ stated that this also

cast doubt on Gidley's credibility. (Tr. 41) Gidley responded to numerous questions by stating that he could not remember, including that he could not remember where he worked after September 2008. (Tr. 41) The ALJ contrasted this to his ability to relate his history and current level of functioning to the consultative examiners without noted difficulty. (Tr. 41) Dr. Walters noted some recall deficits, but the treatment records did not support a complete inability to remember. (Tr. 41) Dr. Prasad also found that Gidley was able to fully register items in a memory test and that he scored two out of three on his recent memory test and had normal immediate memory. This further suggested greater functional ability. (Tr. 41) The ALJ also noted that Gidley's ability to drive himself and his children required a higher memory funtion than he indicated. (Tr. 41) For these reasons, the ALJ did not find Gidley's memory deficit so limiting as to preclude all activity. (Tr. 41)

The ALJ concluded that the overall evidence did not support Gidley's allegations regarding his inability to work. (Tr. 41) Gidley's treatment essentially had been routine or conservative in nature. (Tr. 41) The consultative examiners noted that he had normal appearance and gait, good hygiene, fluent speech, and his physical and neurological examinations were normal. (Tr. 41) Gidley did not display any tearfulness, hopelessness, or helplessness during the examination. (Tr. 41) The ALJ also noted that Gidley did not have any emergency room visits or hospitalizations during the period at issue. (Tr. 41) The ALJ stated that this created doubt about Gidley's credibility and suggested a greater overall functioning ability. (Tr. 41) His alleged inability to stand or sit for prolonged periods was inconsistent based on the lack of treatment during the period at issue and the observations by his treating physician and the consultative examiner. (Tr. 41) The physicians noted that Gildey had normal gait and posture, normal range

of motion in the lumbar spine, and normal neurological exams. (Tr. 41) The ALJ also pointed to Gidley's negative Babinski sign and negative straight leg raising test bilaterally, which further suggested a greater functional ability. (Tr. 41) The ALJ found Gidley's testimony to be vague and inconsistent with the medical evidence of record. (Tr. 41) Although Gidley complained of various problems, the treatment notes, evaluations, and examinations did not suggest an inability to perform simple, routine, and repetitive tasks at the medium exertional level. (Tr. 41)

The ALJ then explained why he gave Dr. Prasad's opinion little weight. (Tr. 42) Dr. Prasad stated that Gidley was unable to meet the competitive standards for remembering work like procedures or performing work at a consistent pace without an unreasonable number or lengths of rest periods and the competitive standards for accepting instructions and responding appropriately to criticism from supervisors. (Tr. 42) Dr. Prasad reported that Gidley could not interact appropriately with the general public or travel in unfamiliar places. (Tr. 42) He further noted that Gidley was unable to understand, remember, and carry out detailed instructions, or to make plans independently of others. (Tr. 42) Dr. Prasad concluded that Gidley's mental impairments prevented him from performing unskilled work, which was not supported by the records. (Tr. 42) Dr. Prasad further noted that Gidley had a low IQ because he scored 20 out of 30 on a mini mental state examination. (Tr. 42) This result suggested a moderate cognitive impairment. (Tr. 42) The ALJ stated that Gidley's ability to drive, perform yard work, and routinely take his kids to school suggested that he could attend and concentrate on some tasks without having to meet production demands. (Tr. 42)

Dr. Prasad diagnosed Gidley with dementia due to head injury, mood disorder, and anxiety disorder, but the ALJ stated that the medical records did not show any evidence of

dementia or basis for the diagnosis of anxiety disorder. (Tr. 42) Dr. Prasad stated that even a minimal increase in mental demands or change in the environment would be predicted to cause Gidley to decompensate and that he would miss more than four days per month due to his impairments. (Tr. 42) The ALJ stated that the medical evidence showed that Gidley only was limited to simple, routine, and repetitive tasks with relaxed or flexible production rate requirements and occasional interaction with the public, co-workers, and supervisors. (Tr. 42) The ALJ stated that Dr. Prasad's opinions were mere conclusions and that he did not provide any explanation of the evidence he relied on in forming his opinion. (Tr. 42) The records show that Dr. Prasad only saw Gidley seven times between May 2010 and February 2011. (Tr. 42) The ALJ found Dr. Prasad's assessments to be sympathetic, considering that his treatment records only showed routine and conservative treatment. (Tr. 42) The ALJ also pointed to the December 2010 treatment notes, where Gidley reported that he was doing great, enjoyed Christmas shopping, and was not on the Celexa that he had been prescribed. (Tr. 42) The ALJ determined that this suggested greater functional ability than reported. (Tr. 42)

The ALJ next pointed to a memory test Dr. Prasad administered where Gidley was able to fully register items and later was able to recall two of the three items. (Tr. 42) The ALJ also inferred a higher memory function because Gidley indicated an ability to drive himself and others, watch television, and reported that he sometimes drove his children. (Tr. 42) The ALJ stated that these activities showed that he was capable of attending to and concentrating on some tasks without having to meet production demands. (Tr. 42)

The ALJ also stated that he gave the state agency medical consultants' physical assessments little weight because the overall evidence of record showed that Gidley was more

limited than was determined by the state agency consultants. (Tr. 43)The disability consultants stated that Gidley's physical impairments were non-severe, but the ALJ found that the overall evidence showed that Gidley had severe physical impairments that limited him to medium exertional demands. (Tr. 43) The ALJ pointed to Gidley's April 2010 MRI to show that Gidley had some lumbar spine abnormalities. (Tr. 43) The ALJ also noted that Dr. Prasad diagnosed Gidley with degenerative disc disease in the lumbar spine. (Tr. 43) Considering the record as a whole, the ALJ found that Gidley's physical impairments limited his functional capacity to less than the full range of medium work. (Tr. 43)

The ALJ gave the state agency psychological consultants' mental assessments great weight. (Tr. 43) He noted that disability consultant Ken Lovko, Ph.D., stated that Gidley had mild restrictions in activities of daily living, but moderate difficulties in social functioning and concentration, persistence, or pace, with no episodes of decompensation. (Tr. 43) Dr. Lovko noted that Gidley was limited moderately in his ability to understand, remember, and carry out detailed instructions. (Tr. 43) Dr. Lovko further found that Gidley was limited moderately in his ability to interact appropriately with the general public and co-workers and that he could not respond appropriately to criticism from supervisors. (Tr. 43) He stated that Gidley was limited moderately in his ability to respond to changes in the work setting, understand, remember, and carry out simple tasks without special consideration, that he could relate on a superficial basis with co-workers and supervisors, and that he could attend to tasks for a sufficient period of time to complete tasks. (Tr. 43) Dr. Lovko reported that Gidley could manage the stresses involved in simple work. (Tr. 43) For these reasons, the ALJ limited Gidley to simple, routine, and repetitive tasks with relaxed or flexible production rate requirements and occasional interaction

with the public, co-workers, and supervisors. (Tr. 43) Disability consultant B. Randal Horton, Psy.D., affirmed Dr. Lovko's assessment. (Tr. 43) After reviewing the record, the ALJ found that the limitations adequately addressed Gidley's mental impairments. (Tr. 43)

The ALJ then summarized his RFC findings. (Tr. 43) He explained that the evidence showed some difficulties but given the routine and conservative treatment, he found that Gidley was capable of performing less than the full range of medium work. (Tr. 43) The ALJ again noted that Gidley's allegations, when considered in combination with the objective medical evidence of record, established some deficits in social functioning and concentration, persistence, or pace. (Tr. 43) Because of these restrictions, the ALJ concluded that Gidley was limited to simple, routine, and repetitive tasks with relaxed or flexible production rate requirements and occasional interaction with the public, co-workers, and supervisors. (Tr. 43) In sum, the ALJ found the RFC supported by the objective medical evidence and other factors as discussed. (Tr. 43)

At step four of the sequential analysis, the ALJ determined that Gidley was unable to perform any past relevant work. (Tr. 44) Considering Gidley's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Gidley could perform, including laundry worker (2,800 jobs), cleaner (17,000 jobs), and laborer (1,200 jobs). (Tr. 44-45)

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are

supported by substantial evidence.  **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  ***Pepper v. Colvin***, 712 F.3d 351, 361-362 (7th cir. 2013); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852 (1972)(*quoting **Consolidated Edison Company v. NRLB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also **Pepper,*** 712 F.3d at 361-362; ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  ***Roddy v. Astrue,*** 705 F.3d 631, 636 (7th Cir. 2013)*; Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.   The claimant must show that he is unable " to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.**" 42 U.S.C. §423(d)(1)(A).** The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R.  § § 404.1520, 416.920**.  The ALJ first considers whether the

claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R.§§ 404.1520(b), 416.920(b).** If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1.** If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e).** However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f).**

Gidley first argues that the ALJ erred in rejecting the opinion of his treating doctor, Dr. Prasad. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. § 404.1527(d)(2);** *See also **Punzio v. Astrue,** 630 F.3d 704, 710 (7th Cir. 2011); **Schmidt v. Astrue**, 496 F.3d 833, 842 (7th Cir. 2007);*

*Gudgell v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) *(quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *See also* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. **20 C.F.R. § 404.1527(c)(2);** *Clifford*, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see e.g. Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted). *See also Punzio*, 630 F.3d at 713.

Gidley argues that the reasons the ALJ rejected Dr. Prasad's opinions were perfunctory. For example, the ALJ found that Dr. Prasad gave conclusions without explanation, only saw

Gidley seven times, appeared sympathetic, and noted that Gidley was not taking his medication and went Christmas shopping. Gidley argues that these are not the types of reasons on which an ALJ may disregard a treating physician's opinion.

In his opinion, the ALJ explained that he gave less weight to Dr. Prasad's opinion both because it was not well supported by the objective medical evidence and because it was inconsistent with substantial evidence of record. To show that Dr. Prasad's opinion was not well supported, the ALJ stated that Gidley received routine, conservative treatment, that Dr. Prasad gave conclusions, rather than explanations, to support his opinions, and that some of Gidley's actions, namely reporting that he was doing great, Christmas shopping, and not taking Celexa, suggested that his impairments were not as severe as Dr. Prasad stated.

The ALJ went on to explain that Dr. Prasad's opinion that Gidley had a moderate cognitive impairment was inconsistent with his activities, including driving, performing yard work, and taking his children to school. The ALJ stated that these activities suggested that Gidley could tend to and concentrate on some tasks and meet production demands. The ALJ then stated that, inconsistent with Dr. Prasad's opinion, the medical evidence showed that Gidley was limited to simple, routine, and repetitive tasks with flexible requirements. However, the ALJ did not point to any evidence to support this conclusion. Finally, the ALJ stated that Gidley's ability to fully register items in a memory test and later recall two of three items rebutted Dr. Prasad's opinion regarding Gidley's memory and ability to concentrate.

Turning first to the ALJ's statement that Gidley received conservative treatment, the ALJ failed to mention, and therefore the court cannot be certain that he considered, that Gidley continued to take Clonozepam and Risperdal for his mental health impairments although he

16

ceased taking Celexa.  It is not clear that he would have reached the same conclusion that Gidley had conservative treatment if he considered all of Gidley's medications.

Moreover, the ALJ criticized Dr. Prasad for giving conclusions, rather than explanations, to support his opinions.  The Commissioner is correct that the opinions of a treating physician that are based solely on the patient's subjective complaints may be discounted.  ***Fuller v. Astrue***, 2013 WL 617073, *9 (N.D. Ill. Feb. 19, 2013) (citing ***Ketelboeter v. Astrue***, 550 F.3d 620, 625 (7th Cir. 2008)).  In ***Fuller***, the ALJ discounted the treating physician's opinion, explaining that it was based on the claimant's objective complaints.  ***Fuller***, 2013 WL 617073 at *9. The court rejected this argument, pointing to portions of the record where the treating physician noted that the claimant was sad, had a limited short term memory, was overwhelmed, had poor hygiene, and was irritable, depressed, and lacked motivation.  ***Fuller***, 2013 WL 617073 at *9.  The court explained that during mental health evaluations, almost all diagnoses require some consideration of the claimant's subjective symptoms.  ***Fuller***, 2013 WL 617073 at *9. Provided that the record does not suggest that the treating physician disbelieved the claimant's description of his symptoms or that the doctor relied more heavily on the claimant's description of his symptoms than his own clinical observations, the treating physician's consideration of the claimant's subjective symptoms when considered in combination with his own clinical observations is not a basis on which to reject the treating physician's opinions.  ***Fuller***, 2013 WL 617073 at *9.

Here, Gidley's treating psychiatrist made similar observations.  He noted that Gidley was depressed, angry, agitated, had anxiety, anger, and poor concentration, his memory was impaired, and he was unable to tolerate frustration.  (Tr. 421, 428, 430) There is nothing to suggest that these notes merely were a recitation of Gidley's complaints and not Dr. Prasad's

own observations, nor did the ALJ provide any explanation or point to any evidence to support a conclusion that Dr. Prasad relied more heavily on Gidley's complaints than his own observations. Absent some indication that Dr. Prasad's notes were not based on his own observations, the court does not agree that Dr. Prasad relied on conclusions rather than observations to support his opinions.

The ALJ also discounted Dr. Prasad's opinion because of one report that Gidley was doing great, he went Christmas shopping, and he stopped taking Celexa. As explained above, it is not clear that the ALJ considered that Gidley continued to take other medications. Moreover, one report that he was "doing great" is not significant evidence upon which the treating physician's opinion may be disregarded.

In addition to considering Gidley's ability to go Christmas shopping to show that Dr. Prasad's opinion was not supported by substantial evidence, the ALJ relied on Gidley's report that he was able to drive, perform yard work, and take his children to school to support his conclusion that substantial evidence conflicted with Dr. Prasad's opinion. The notes to SSR 96-8P explain that the "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." When making this determination, the ALJ may consider the claimant's daily activities. If the ALJ places significant weight on a claimant's daily activities to support a finding that the claimant can sustain employment, the activities must reflect that the person is capable of engaging in work eight hours a day for five consecutive days a week. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). *See also Hughes v. Astrue*, 705 F.3d 276, 278-279 (7th Cir. 2013); *Roddy v. Astrue*,

No. 12-1682 (7th Cir. Jan. 18, 2013). To show this, the record should reflect that the claimant engaged in such activities for a substantial part of the day. *Carradine*, 360 F.3d at 756. Evidence of sporadic physical activity is not sufficient because a claimant may engage in sporadic activities despite pain, but may not be able to engage in continuous activity for an 8-hour workday. *Carradine*, 360 F.3d at 756. Moreover, the activities must be translatable to a work setting. *Carradine,* 360 F.3d at 756. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons. . . , and is not held to a minimum standard of performance, as she would be by an employer." *Hughes*, No. 12-1873. The ALJ must make a clear record that the claimant's activities are such that the claimant could perform duties common to the work place on a sustained basis. *Carradine,* 360 F.3d at 756.

In *Carradine*, the claimant testified that she could drive, shop, and do housework. *Carradine,* 360 F.3d at 756. The ALJ relied on this when determining that the claimant was capable of working. *Carradine,* 360 F.3d at 756. On appeal, the Seventh Circuit explained that although the claimant could perform these activities, the claimant performed the reported activities on a sporadic basis, and the record was not clear whether these skills were capable of translation to a work setting or whether the claimant could sustain activity on a continuous basis during an 8-hour work day. *Carradine,* 360 F.3d at 756. The Seventh Circuit remanded for further explanation of how the claimant's reported daily activities were consistent with a finding that she could engage in work eight hours a day, five days a week. *Carradine*, 360 F.3d at 756.

In *Carradine*, the claimant's activities were the basis of the ALJ's decision. Here, that is not the case. Rather than relying on these activities to show that overall Gidley could perform

work, the ALJ pointed to the specific activities for the limited purpose of showing that because Gidley could perform these activities, he could maintain concentration longer than Dr. Prasad reported. The ALJ's reliance on his activities for this limited purpose of showing Dr. Prasad's opinion was not supported does not require the same in depth analysis as set forth in ***Carradine***. However, the court already has identified flaws in the ALJ's analysis that require remand on this issue.

In response to Gidley's argument that the ALJ did not give Dr. Prasad's opinion sufficient weight, the Commissioner states that the ALJ considered that Gidley reported being hot headed, angry, and depressed. Although the ALJ did mention these self-reports, it is not clear that the ALJ also considered Dr. Prasad's personal observations of Gidley. Rather, the Commissioner attempts to dismiss Dr. Prasad's observations as conclusions, but as the court has explained, there is a close correlation between observations and recitations of the claimant's subjective symptoms. The ALJ must distinguish this on remand.

The Commissioner also has referred the court to a December 2010 note that Gidley was doing great, his new medication was good for him, and that he looked more relaxed on Clonazepam and Risperdal. However, the record does not reflect that the ALJ considered and relied upon this information. Although Dr. Prasad's opinion may not be based on objective tests, given that he saw Gidley for mental impairments, his observations should have been given some weight absent an explanation of how they were internally inconsistent or inconsistent with substantial evidence of record. The ALJ has failed to show that he considered Dr. Prasad's observations and Gidley's ongoing medication, and therefore, he must consider this on remand.

Gidley next complains that the ALJ erred in determining his mental RFC. Specifically,

the state agency psychological consultant, Dr. Lovko, limited Gidley to superficial contact with co-workers and supervisors. Instead of adopting this, the ALJ determined that Gidley could have occasional interaction with co-workers and supervisors with no explanation. The Commissioner argues that Dr. Lovko stated that Gidley could "relate on *at least* a superficial basis", but the final determination of a claimant's RFC is the decision of the ALJ. It is the Commissioner's position that the ALJ limited Gidley to occasional interaction, rather than superficial interaction, based on the record as a whole.

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum
> amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. *See Morphew v. Apfel*, 2000 WL 682661 at *3 ("There is a distinction here [in SSR 96-8p] between what the ALJ must consider and what the ALJ must articulate in the written opinion."); *Lawson v. Apfel*, 2000 WL 683256, *2-4 (S.D.Ind. May 25, 2000) (ALJ who

restricted the claimant to medium work satisfied the requirements of SSR 96-8p)("[SSR 96-8p] does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather, an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities."). The ALJ is required to "consider the aggregate effect of this entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). The ALJ cannot ignore entire lines of evidence or cherry pick the evidence that is favorable to a finding of non-disability. *Golembiewski*, 322 F.3d at 917. Rather, the ALJ must weigh all impairments and consider the effect these ailments have on the claimant's ability to function in their entirety.

The ALJ had a duty to explain how he determined the RFC and to explain the inconsistencies in the record. Here, he made no attempt to explain the basis of his decision to limit Gidley to occasional interaction rather than superficial interaction, nor is it apparent from the record. The medical opinion to which he assigned great weight included a more restrictive limitation on Gidley's social interaction. The ALJ did not point to even one additional piece of evidence that contradicted Dr. Lovko's opinion, and the court cannot speculate as to the ALJ's reasons. Therefore, the Commissioner must address this on remand.

Next, Gidley argues that the ALJ's conclusion that Gidley had moderate limitations in concentration, persistence, and pace was not supported. Gidley explains that the state agency psychologist reported that he could not answer a series of questions, was unable to recall one of three cities after a five minute period, and could not perform multiplication, division, or addition problems. Similarly, Dr. Prasad administered a psychological test in 2010 and found that Gidley

could not perform simple mathematics or comprehend world issues, had a poor long-term memory, and had a limited fund of knowledge. Gidley further argues that the question the ALJ posed to the VE, which limited the hypothetical individual to simple, routine, and repetitive tasks, did not account for the his ultimate finding that Gidley had a moderate limitation in concentration, persistence, and pace.

The Commissioner first disputes whether the ALJ posed a correct hypothetical to the VE. Generally, the ALJ must incorporate all of the limitations he finds into the hypotheticals posed to the VE. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Although the wording does not have to be identical, it must be clear that the limitations were accounted for. *Bryant v. Astrue*, 2012 WL 3114553, *5 (July 31, 2012). In *O'Connor–Spinner*, the Seventh Circuit reversed and remanded the district court's decision denying benefits, finding that it was unclear from the ALJ's restriction to "routine, repetitive tasks with simple instructions" whether the VE properly was informed of and accounted for limitations in "concentration, persistence and pace." *O'Connor–Spinner*, 627 F.3d at 620–21. Noteworthy, in *O'Connor-Spinner*, the Seventh Circuit explained that it does not insist on a per se requirement that the specific terminology "concentration, persistence and pace" be used in the ALJ's hypothetical to the VE in all cases. *O'Connor–Spinner*, 627 F.3d at 619.

The instant facts are distinguishable from *O'Connor-Spinner* because here the hypothetical the ALJ posed to the VE mirrored his RFC finding. Although the ALJ noted that Gidley had a moderate limitation in concentration, persistence, and pace in his Listing assessment, he did not incorporate this finding into Gidley's RFC. He also added an additional limitation, stating that Gidley only could perform jobs that had a relaxed or flexible production

rate requirement. Because the ALJ's hypothetical incorporated his RFC finding in its totality, the court does not find that the ALJ erred on this issue.

Gidley further asserts that the ALJ's conclusion that he had moderate limitations in concentration, persistence, and pace was not supported by the medical evidence. However, the ALJ provided substantial justification for his conclusion, citing to notes provided by both the consultative examiner and Gidley's treating physician. The ALJ noted that Gidley's recent memory was preserved although he had difficulty with his remote memory. Gidley scored two out of three in his recent memory test and had a normal immediate memory, which suggested greater functional ability. His treatment notes also revealed that he was alert and oriented but could not concentrate. The ALJ also stated that Gidley's neurological examination and cranial nerve examination were normal which further suggested greater functional ability. Although Gidley can point to evidence that contradicts the ALJ's conclusion, the ALJ accounted for Gidley's memory problems by limiting him to simple, routine, and repetitive tasks with relaxed or flexible production rate requirements, and pointed to tests that showed that his limitations in concentration, persistence, and pace were not as restrictive as he insists. The ALJ satisfied his burden by pointing to sufficient evidence to show this. However, when reconsidering Dr. Prasad's treatment, the ALJ may need to re-address this issue.

Gidley next complains that the ALJ erred in determining his physical RFC. The ALJ determined that Gidley was limited to medium exertional demands, which means that he could lift no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. Gidley argues that the ALJ could not have formed the basis of his RFC from a medical opinion because he rejected the opinions of the two state agency doctors and did not

24

consider his MRI. The Commissioner responds that the ALJ's opinion was supported because he relied on Gidley's sporadic and conservative treatment, consistently normal examination findings, and the reports that he functioned independently. The Commissioner also responded that the ALJ considered Gildey's MRI.

The ALJ noted that Gildey's MRI revealed that he had some mild to moderate lumbar spine abnormalities but did not explain how this finding was inconsistent with, rather than supportive of, the state agency consultative physicians' opinions. However, the ALJ went on to explain that Gidley had normal examinations. He noted that the findings of Gidley's examinations included normal gait, straight leg raising tests, sensation, reflexes, and muscle strength, and included findings of full range of motion with one report of reduced lumbar flexion and muscle spasms. Although Gildey insists that the ALJ relied on the boilerplate language that his treatment was conservative and sporadic, the ALJ did point to examination findings to support his conclusion.

As a final challenge to the ALJ's RFC determination, Gildey complained that the ALJ did not consider his obesity. If a claimant is obese, the ALJ specifically must address the "incremental effect" of obesity on the claimant's limitations. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Even if a claimant does not contend that obesity is one of his impairments, SSR 02-1p requires an ALJ to consider the effects of obesity on the claimant's other conditions. However, failure to explicitly consider these effects can be "harmless error." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). Since the ALJ in *Prochaska* "sufficiently analyzed" the claimant's obesity (by implicitly considering the issue, in part by relying on medical documents that noted the claimant's height and weight), and because the claimant did

not specify how obesity specifically impaired her work ability, the Seventh Circuit found that any error on the ALJ's part in explicitly considering the claimant's obesity was harmless. *Prochaska v. Barnhart*, 454 F.3d at 737. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)(ALJ's adoption of limitations suggested by doctors who were aware of claimant's obesity, plus claimant's failure in specifying how weight impaired the ability to work, was harmless error).

The record is clear that the ALJ considered Gidley's obesity. The ALJ noted Gidley's weight and BMI which fell within the range for overweight but below the range for morbidly obese. The ALJ explained that the record did not contain any evidence that Gidley's obesity exacerbated his symptoms or caused exertional limitations. He explicitly noted that Gidley was obese and explained that further limitations were not supported by the record. Gidley has not demonstrated that his obesity caused further limitations, and none of the physicians noted that he did. Therefore, any error on behalf of the ALJ to further explain why he found that Gidley's obesity did not further affect his ailments was harmless.

Gidley also contested that the ALJ did not consider his testimony in considering his physical RFC. However, the ALJ did not find Gidley's testimony credible, another finding Gidley challenges. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v.*

*Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. §404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529**( c); *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the

claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* ***Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine***, 360 F.3d at 754 ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994); *see also* ***Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." **SSR 96-7p, at *2.** *See **Zurawski***, 245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." ***Zurawski***, 245 F.3d at 887 (*quoting*

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Gidley argues that the ALJ erred in rendering his credibility determination because he failed to account for the fact that there were differences between activities of daily living and activities required by a full time job, did not consider that his MRI showed nerve aggravation that could have caused the pain to which Gidley testified, did not consider Dr. Prasad's notes in conjunction with Gidley's testimony that he fell often, did not consider the medical notes that supported his testimony concerning memory loss, and did not consider the reasons he did not seek out more medical treatment.

Gidley first explains that although he attempted to perform household work during the day, his health problems made it difficult for him to perform these basic tasks.  The court agrees that the ALJ must account for the differences between performing work at home compared to a work place setting, particularly the variance in flexibility.  *See Bjornson,* 671 F.3d 640, 647 (7th Cir. 2012).  However, the ALJ did not rely on these activities to show that Gidley could perform work.  Rather, the ALJ stated that the activities showed that Gidley was not as limited as he stated. His activities were one factor among many that the ALJ relied on.  The ALJ did not err in considering whether the activities Gidley actually performed were consistent with his testimony,

and he was not required to delve into the analysis Gidley proposed to show as much.

The ALJ also stated that the medical evidence did not show any nerve aggravation or compression to the lumbar spine to show that Gidley's complaints of pain, numbness, and muscle weakness were not supported by the medical evidence. Gidley explains that his MRI showed that he had stenosis of the spine. However, the Commissioner argues that the MRI reported "no significant compressive features." (Tr. 392) When read as a whole, the MRI reported mild to moderate stenosis in certain parts of the spine, but otherwise no compressive features. Because the ALJ mischaracterized the evidence, the court cannot be certain that he considered this aspect of the MRI when discrediting Gidley's testimony.

Likewise, the ALJ stated that Gidley was not credible because he testified that he experienced dizziness but that the record revealed that he only fell one time. The record does not support this conclusion. Rather, Dr. Prasad noted that Gidley did not know how many times he had fallen because he did not count. This statement certainly suggests that he fell on more than one occasion. Again, the ALJ must consider this and provide further explanation.

Gidley further complains that the ALJ's credibility determination was flawed because the ALJ recognized that Gidley could not often remember details at the administrative hearing but found that his inability to remember was not credible based on two consultative examinations. Gidley explains that the conclusions the ALJ drew from these tests were not supported by the actual results. Specifically, Gidley criticizes the ALJ for relying on the portion of Dr. Walters report that noted some recall deficits because the report states that Gidley had a fund of information that was poor to fair. Gidley also could name only three seasons and could not cite a current event. The ALJ also pointed to Dr. Prasad's report that Gidley was able to fully register

items in a memory test, but Gidley complains that the test actually showed that he had poor remote memory and scored a 2/3 on the recent memory test. Therefore, Gidley argues that the tests the ALJ relied on to show that he was not credible are not actually inconsistent with his testimony.

The Commissioner responded that the ALJ did not find that Gidley's memory problems were not credible based on the consultative examinations. Rather, he found that Gidley's testimony was vague and that he responded to several questions saying that he could not remember. The ALJ contrasted this with Gidley's ability to relate his medical history and level of functioning to consulting examiners without noted difficulty.

At the hearing, Gidley responded that he could not remember to numerous questions. However, the ALJ pointed to several notes throughout the record to show that his memory was greater than he revealed at the hearing. This is not to say that Gidley's memory was intact, only that he had a greater ability to function than his testimony suggested. The ALJ accomplished this by pointing to both medical records and Gidley's daily activities to show that they required a greater mental functional capacity than that which Gidley revealed at the hearing. Notably, Gidley was able to relate his history and current level of functioning to the consultative examiners, although he could not do the same at the hearing. The court does not find that this portion of the ALJ's credibility determination was patently flawed.

Gidley further complains that the ALJ should have inquired about his reason for failing to seek treatment. Gidley states that he was unable to afford treatment and did not know that he could apply for Medicaid. However, the ALJ discredited this statement because Gidley spent $1,000 on his children's Christmas presents. For the ALJ to draw inferences about the

claimant's condition from a failure to seek out treatment, an ALJ first must discern from the claimant the reasons he did not pursue additional treatment. **Craft v. Astrue**, 539 F.3d 668, 679 (7th Cir. 2008)(failure to comply due to inability to pay for treatment, for example, may be an acceptable reason for non-compliance). If the ALJ decides to disregard the claimant's reason for failing to pursue treatment, the ALJ must provide an explanation. **Roddy v. Astrue**, 705 F.3d 631, 638 (7th Cir. 2013)(explaining that the ALJ must elicit reason for failing to pursue medical treatment).

The ALJ explained that Gidley was on his wife's insurance plan until September 2010. However, his treatment was sporadic and conservative while he was on her plan. The ALJ stated that after he was removed from his wife's insurance plan, he was able to spend $1,000 on his children's Christmas presents. Although the ALJ did not inquire where this money came from, this seems immaterial. If Gidley was able to save, borrow, or purchase the gifts on credit, there is no reason he could not have applied the money to his medical care. Moreover, Gidley has not demonstrated that the money came from some source that would have prohibited him from spending the money on his medical treatment. Although the court does not find error with this portion of his credibility analysis, for the reasons cited above, the ALJ must reconsider his credibility analysis.

Based on the foregoing, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this Order.

ENTERED this 30th day of December, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge